METROPOLITAN GRAIN & STOCK EXCHANGE *v.* CHICAGO BOARD OF TRADE and another.

*(Circuit Court, N. D. Illinois.* March 12, 1883.)

1. EX PARTE INJUNCTION—MOTION TO DISSOLVE.

A motion to dissolve an *ex parte* injunction may be made before answer.

2. BOARD OF TRADE—RIGHT TO EXCLUDE REPORTERS OF TELEGRAPH COMPANIES —MARKET REPORTS.

A board of trade, composed of merchants dealing in the products of the country, who solely for their own convenience provide a room where they meet to transact business, although incorporated under the laws of the state, is not a public corporation, and is not obliged to allow the reporters of a telegraph company on the floor of its exchange for the purposes of collecting and transmitting the reports of the markets therefrom.

3. TELEGRAPH COMPANIES—NOT BOUND TO COLLECT AND TRANSMIT INFORMATION.

It is no part of the duty of telegraph companies to collect and transmit information; and while they are bound, if they voluntarily follow that class of employment, to do it with fidelity during the continuance of their contract, when they terminate such contract no person can compel them to enter into another, or continue it when they wish it terminated.

In Equity.

*Lyman Trumbull* and *Leonard Swett*, for plaintiff.

*Lawrence, Campbell & Lawrence*, for defendants.

BLODGETT, J. The bill in this case was originally filed in the circuit court of Cook county, on the thirtieth of December last, praying an injunction restraining the defendant, the Mutual Union Telegraph Company, from breaking the connection of its wires and instruments on the floor of the exchange room of the board of trade with the telegraphic instrument in complainant's office, and that the board of trade be enjoined and restrained from in any manner interfering with the sending by the telegraph company by means of its wires and instruments to complainant's office of reports of the prices of commodities and transactions on the board of trade. An *ex parte* order was made by one of the judges of the circuit court, directing the issue of a writ of injunction according to the prayer of the bill. The case was subsequently removed to this court, where the record was filed on the ninth of February last, and a motion is now made for a dissolution of the injunction so granted by the state court. On the hearing of this motion it was objected that defendant's answers, not being under their respective corporate seals, and not being verified by the oath of a proper officer of the respective defendants, the court could not entertain this motion. The seal of the board of trade was attached to its answer at the hearing, and since the hearing, by leave of the court, the answer of the telegraph company has been withdrawn from the files and its seal affixed, so that this objection may be considered as obviated by what has been done since it was stated.

I was, however, disposed to treat the case as not coming within the rule urged, for the reason that the injunction was granted without notice to the defendants, and I understand the practice, both in the state court and this court, is to allow a defendant who has been enjoined by an *ex parte* injunction to move its dissolution at once, without requiring him to put in an answer as a condition upon which such motion will be heard. In other words, it seems to me the court should consider the question as to the further continuance of this injunction in the same way it would consider and act upon a motion for injunction when the defendant has notice, and both parties are heard. The bill in this case waives the answer under oath, and, for the purposes of the case, is a mere pleading. Complainant has waived the right which is given a complainant in a court of equity to search the consciences of the defendants as to the facts on which it seeks relief, and it may well be doubted whether the old rules, formulated before the practice of waiving defendant's answer under oath was adopted,

are to be so strictly enforced as formerly. Being of opinion, therefore, that the motion to dissolve, in the present condition of the record, should be entertained, I proceed to consider it briefly on its merits.

The Chicago Board of Trade is an organization or guild of persons dealing mainly in the agricultural products of the west and northwest, which find a market in the city of Chicago. The board is a corporate body acting under a charter granted it by the legislature of the state of Illinois. It does not, and is not by its powers, authorized to deal in any kind of commodities, but it has provided a large exchange room, fitted up with suitable accommodations, where its members meet at stated times and buy and sell among themselves. Among the accommodations thus provided by the board for the use of its members, and paid for out of the annual dues or assessments of *its* members, or from other income belonging to the board, are reports of the markets in most of the important commercial centers of the world, and it is presumable that most of the dealings in this exchange room, between members of the board, are, to some extent at least, influenced by these market reports. The Mutual Union Telegraph Company owns and operates telegraph lines between Chicago and New York, as well as several other important cities. For some time past this telegraph company has had wires running into this exchange room, and kept instruments, operators, and reporters there to gather and report the ruling market prices as they were from time to time shown during the daily sessions by transactions between members of the board dealing there. The telegraph company also had a wire running from this exchange room to a Morse instrument in complainant's place of business, and has for upwards of a year sent over its wires to complainant's office reports of the opening prices and all changes of prices during the daily session of the board for the leading commodities dealt in there. And complainant's business has been and is to deal, to some extent at least, with persons frequenting its office, in the same class of commodities as are dealt in by members of the board of trade. Complainant, while it has had these reports of prices on the board from the telegraph company, has paid therefor at the rate of $25 per week, and avers its willingness and ability to continue to pay therefor whatever price shall be required.

It further appears that some time in December last the Chicago Board of Trade notified the telegraph company that it should not allow the operators and reporters of the telegraph company, after the first of January, to attend the daily sessions of its members in the ex-

change room, and send reports therefrom to complainant and other persons transacting business upon the same methods and system as complainant. The telegraph company notified the complainant of the action of the board of trade in the premises, whereupon complainant filed the bill now before the court and obtained the injunction as stated. The board of trade contends: (1) That it has the right to exclude persons from the floor of its exchange who come there for the purpose of collecting and sending out reports of the market as the same is developed by transactions between its members; that it is under no obligation to allow the agents of the telegraph company to attend upon the exchange for the purpose of collecting and reporting prices therefrom. (2) That complainant uses the market reports so obtained, through the agency of the telegraph company, mainly, if not wholly, for the purpose of making, or encouraging others to make, gambling contracts as to the rise or fall in price of the commodities dealt in on the board.

While the telegraph company insists that it has no right to keep its reporters, operators, wires, and instruments upon the floor of the exchange, except by permission of the board of trade, and that, when it was notified that it must desist from supplying complainant with its reports, it had no other course to adopt but to notify complainants that its reports would be stopped, it also insists that it is no part of its corporate duty or business to collect and send these market reports, and that it is under no obligations to complainant or the public to do this kind of work, except of its own volition.

The material question, as it seems to me, is whether the board of trade is obliged to allow reporters of the telegraph company on the floor of its exchange for the purposes of collecting and transmitting reports of the market therefrom. Complainant insists that the public have a right to the information afforded by these market reports, and that, because the two defendants are corporations, the board of trade is obliged to allow reporters on its floor, and the telegraph company is obliged to transmit such reports to whoever requires them and is willing to pay for them. The board of trade is a private corporation. It exercises no franchise which clothes it with any of the duties of a public corporation; it has no power of eminent domain, and no such duties are charged upon it toward the public as have heretofore been held by the courts to characterize or distinguish a public from a private corporation. It is only an association of merchants dealing in the products of the country, who, solely for their own convenience, provide a room where they meet to transact business. They have a

right to exclude all other persons from the meetings of the board, or to admit only such as they choose. If out of compliment they give one person a ticket to their floors, it furnishes no reason why they should issue a similar ticket to another, any more than because one of its members invites a guest to dine at his house the whole public have the same right to an invitation. As the proof shows, the board, at great expense, secures for the use of its own members reports of the market rates in other parts of the world. The claim of complainant, if allowed, would make these reports public property, and give the persons not members of the board, and who, perhaps, never could attain the position of membership of this body, all the advantages of membership. That is to say, if a person who has been expelled from this body for violation of its rules and regulations, can thus compel the board of trade to allow the telegraph company to send to his office in this city or elsewhere reports of transactions on the board, he has all the benefits of a membership from which he has been excluded by, perhaps, his own misconduct. It is absurd to say that information thus obtained for private use becomes public property, merely because it is collected and paid for through the agency of a private corporation. Transactions on the board are not public only so far as the board or its members see fit to make them so. Undoubtedly, the members of the board who act as agents, brokers, or factors for others, can be compelled by their principals to disclose prices to them, but not to the public. It is only those acting on the board for others—their principals—who can be required to make disclosures of their transactions, and then not to the public, but only to those for whom they are acting. Members of this board can go "on change" and deal with each other privately, and are not compelled to let the public know the prices at which they deal. The mere fact that they have been in the habit of informing the public of prices is no evidence that they are obliged to do so if they do not see fit to do it. In fact, we often see, as a matter of common knowledge and information, quotations made of large transactions between different dealers on the board in commodities, at prices not made public, thereby showing clearly that they exercise their own option of withholding from the public information as to their prices.

The proof shows that the telegraph company has been permitted by the board to have its reporters, operators, and instruments upon the floor of the exchange for the purpose of obtaining and sending out information as to prices, but as the telegraph company enjoyed this privilege only at the will and sufferance of the board, there can

be no doubt of the power of the board to close its doors against the employes of the telegraph company whenever it sees fit to do so; and it necessarily follows that when the board excludes the telegraph company from the exchange the company must cease to send reports to complainant. In other words, the arrangement by which the complainant got the reports being at the sufferance of the board, the telegraph company can send them only by permission of the board. The telegraphic instrument in complainant's office and the wires by which it is connected with the main line can no longer be used for the purpose for which they were placed there, and therefore it cannot harm complainant to have them removed.

The further reason which was urged in behalf of the telegraph company, that it is no part of the duty of the telegraph company to collect and transmit information, seems to be cogent and forcible. If they volunteer to follow that class of employment they are bound, perhaps, to do it with fidelity while their contract continues; but whenever they terminate their contract no person can compel them to enter into another, or to continue it when they wish it terminated. The defendant gave the complainant due and ample notice of more than a week, of its intention to withdraw its reports, and therefore terminate its contract with the plaintiff, which, it seems to me, it had the right and power to do, and I do not know of any power which can enforce and compel the telegraph company to gather news and transmit it when it ceases voluntarily to enter upon and continue in that class of business. If the telegraph company has assumed any contract obligations to the complainant which it is unable or unwilling longer to fulfill, complainant has an ample remedy at law for the damages sustained.

The view I take of the rights of the board of trade in the premises makes it unnecessary to consider the second point made by the defense, namely, that complainant uses the reports for gambling purposes. The injunction will be dismissed.